Vito J. Titone, J.
These consolidated proceedings have been brought by more than 250 Richmond County property owners pursuant to CPLR article 78 and section 311-2.0 of the New York *51 City Administrative Code of 1938. The petitioners challenge the validity of the special assessment levied against their respective properties in connection with an alleged improvement commonly referred to as the Nicholas Avenue Combined Sewer project. For the reasons set forth below, the court concludes that the entire assessment is void and it must be vacated and set aside.
Prior to the adoption by the voters of the New York City Charter in the November, 1961 general election, the law, in substance, was that the cost of construction of a sewer such as this one was borne in large part by the owners of the property benefited by the installation. The theory was that the property directly benefited by the improvement should pay for it in the form of a special assessment, while other property owners throughout the city, not directly benefiting, were not called upon to defray the expenses involved. The statutory provisions for this were found in chapter 12 of the 1938 Charter, sections 291 to 320. The same system had been used under prior charters.
With the advent of city-wide planning, however, the “ local levy ” concept began to lose its validity. For one thing, local groups had the power to frustrate orderly growth by blocking or at least delaying such projects. Also, in an urban complex as. intensely developed as New York City, it is quite difficult to delineate where a benefit area begins and ends. It was time for a change.
On March 8, 1961 the State Legislature amended the City Home Rule Law by adding a new subdivision 4 to section 20 (L. 1961, ch. 87) which permitted a mayor of a city to appoint a charter revision commission to prepare and submit to the voters of a city a new city charter. Mayor Wagner of New York City appointed such a commission (called the City Charter Revision Commission) and the charter drafted by it was submitted to the voters and approved by a majority of them in the general election held that year on November 7, 1961.
It seems clear that the charter approved by the People in 1961 completely did away with the old system of levying special assessments on benefited property owners. As stated above, the old method was set forth in chapter 12 of the 1938 Charter and it provided the system for deciding when and where an improvement was needed, what property would be benefited, who should pay for it and how much, and the procedure for protest by the taxpayers. All of this was abolished by the new charter. There is no longer any power in any agency or legislative body either to authorize, levy or collect such assessments. In fact, the only substantive mention of special assessments in the new charter *52 is found in chapter 12 at section 300, which merely provided for the payment out of funds already collected pursuant to such assessments.
Subdivision a of section 1151 of the new charter provides in substance that all laws that “ are inconsistent with the provisions of this charter ’ ’ are repealed upon the new charter taking effect. The 1938 Charter, containing in its chapter 12 an elaborate arrangement for authorizing, levying, etc. such assessments, is clearly “ inconsistent with the provisions ” of the new charter, which excised completely the mechanism for local assessments. As far as the latter 'are concerned, there is no way the two charters can exist simultaneously. (See Abate v. Mundt, 25 N Y 2d 309, 318 [1969]; Pratt Institute v. City of New York, 183 N. Y. 151 [1905].)
Pursuant to subdivision 3 of section 306 of the old charter, the Board of Assessors (whose very creation lay in section 305 of the old charter) apportioned and assessed the cost of the Nicholas Avenue sewer upon the property allegedly benefited, i.e., upon petitioners’ property. They did this many years after their demise via the new charter. They did this pursuant to statutes which were nonexistent at the time they acted. Their actions were utterly void since there was no valid statutory authority upon which they could base their levies, or even their existence. Apparently someone realized that the new charter had this effect because, on December 29, 1961 (an interesting date, just two days prior to the day when local assessments were to meet their demise under the new charter) a local law was passed by the City Council purporting to add section 1149 to the new charter in an attempt to save authorized but unlevied special assessments. For the reasons set forth below, this “ amendment ” is void.
The 1961 amendment to the City Home Buie Law, which authorized the establishment of a charter revision commission as discussed above, provided at paragraph (d) of subdivision 4 of section 20 in pertinent part: “If such question [whether or not the new charter should be adopted] shall receive the affirmative vote of a majority of the qualified electors of the city voting thereon it shall take effect as specified therein and the new city charter so approved shall be the charter of the city and shall become operative as prescribed therein.” (Emphasis added). .
In this connection, the charter as approved by the voters in November, 1961 stated at section 1152: “ This charter shall take effect on the first day of January nineteen hundred sixty- *53 three and thereafter shall control in respect to all the powers, functions and duties of all officers, agencies, and employees of the city as provided herein, except that paragraph b of section two hundred eleven and chapter twelve hereof shall take effect on January first, nineteen hundred and sixty-two.” Thus, it is clear that, with the exceptions* specifically set forth in section 1152, the charter did not become effective until January 1, 1963. Particularly, section 42 of chapter 2 was not operative until that date, and this section and no other sets forth the procedure for amending the new charter.
In spite of this, on December 29, 1961 (over one year prior to the effective date) in an 11th hour move, the City Council and the Mayor purported to amend the new charter by enacting Local Law No. 93 (Local Laws, 1961, No. 93 of City of New York, § 5), which added section 1149 to the new charter, and which provided in relevant part in subdivision a: “ Any assessable improvement * * * finally authorized by the board of estimate prior to January first, nineteen hundred sixty-two * * * shall be processed to completion and assessments shall be levied and collected therefor in accordance with ’ ’ the old or 1938 Charter. It should be emphasized that section 1149 was not part of the charter that was submitted to the People in the November, 1961 election. It was added after the election and was to become law on January 1,1962.
By its very terms, Local Law No. 93 stated that it was an amendment to the new charter. The only way that the new charter could have been amended by a local law was pursuant to subdivision 1 of section 42 thereof. There was and is no other authority for amendment by local law. Yet subdivision 1 of section 42 was nonexistent at the time the City Council acted on December 29, 1961. Thus there was no authority in the City Council to do what it did and no legislative basis for Local Law No. 93. It was and is void and cannot be used to justify respondents’ assessing petitioners’ property to pay for the Nicholas Avenue Combined Sewer Project.
With the benefit of hindsight it can be seen that section 1149 should have been made part of the charter that was presented to the People in the first place, or perhaps the new charter should have provided that its amendatory provisions would go into effect immediately. But none of this was done, and the court is powerless to retroactively insert what was omitted, just as the *54 City Council was powerless to do so following the 1961 election. If the contrary were true, what was to stop the City Council from revoking and/or adding entire chapters? What was to stop them from drastically changing that which the People had voted upon?
The recent case of Matter of Nolan v. Bureau of Assessors of N. Y. City Finance Administration (31 N Y 2d 90 [1972]) does not require a different result. There, as stated in the second paragraph of the opinion, the only issues before the court were: (1) whether the sewer work involved was ¡a nonassessable repair; (2) whether the work done actually benefited petitioners’ property; and (3) whether the assessments were barred by laches. No other issues were considered and, specifically, as disclosed by a reading of the record on appeal and the briefs, no one raised or argued the question of whether or not Local Law 93 and section 1149 were valid. Thus the court’s passing comment (p. 94) that " projects authorized prior to January 1, 1962 which were not affected by the repeal ’ ’ is dictum, is not a ruling on section 1149’s validity and, accordingly, is not germane to the instant case on that point.
Even if it could somehow be held that the new charter did not eliminate special assessments or that, although it did, section 1149 validly extended 1938 Charter treatment to this assessment, still the petitioners must prevail.
The evidence showed that the respondents failed to comply with many substantive provisions of the 1938 Charter, so that the assessment should be voided under that statute as well.
The most significant violation of the 1938 Charter’s chapter 12 pertaining to special assessments is the failure by respondents to adhere to the “ final authorization ” for this project made by the Board of Estimate in its resolution of September 17, 1959. The map ultimately used in the actual levy of 1970 was vastly different from the one adopted by the Board of Estimate years earlier. The evidence showed that large areas on the board’s map were not assessed, some areas not on that map wepe assessed, but most important perhaps, there were vast areas that were clearly “ benefited ” by this project under any objective view that were not assessed.
The evidence showed further that developments subsequent to 1959 required a substantial alteration to the board’s 1959 map. Respondents’ own firm of consulting engineers recommended that application be made to the board for authorization for the changes, and its representative testified that his firm understood that this was going to be done. It never was.
*55 The respondents, then, used a map which had never been approved by the Board of Estimate pursuant to section 300 of the 1938 Charter. This voided the assessment. At New York Jurisprudence (vol. 55, Special Assessments, § 178, pp. 181-182), it is stated: “ Since determination of the district or area of assessment for a local improvement constitutes the exercise of legislative power, the common council of a city or other local legislative body may, if consistent with its charter and rules of action, rescind previous votes and amend earlier resolutions relating to the determination of the assessment district, at least before the rights of third persons have vested. * # * However, a commissioner of assessment has no power to increase or decrease the area of assessment once it has been established by the appropriate authorities; his duty is solely to distribute the amount required for the payment of the cost and expense of the improvement over the lands within the area of assessment. Nor may local authorities disintegrate a plan certified to them by higher authority as to the area of improvement and use such fragments of it as they wish, limiting the improvement to a portion of the original area and selecting a plan of their own.”
In Matter of City of New York (Pugsley Ave.) (218 N. Y. 234, 240 [1916]) the Court of Appeals said: “ The commissioner of assessment had no power to increase or decrease the area of assessment or to increase or reduce the amount to be assessed. These matters are determined by the board of estimate and apportionment and the cost of acquiring the property involved in the proceeding. The cost and expense having been determined it was the duty of the commissioner of assessment to distribute this sum over the lands within the area of assessment, and the distribution was required to be made in proportion to the benefits received by the improvement. ’ ’ These respondents, the Bureau of Assessors, the City of New York, and the Board of Revision of Assessments, had no power to alter the board’s map without its approval, yet that is precisely what they did. (See, also, Matter of New York Prot. Episcopal Public School, 75 N. Y. 324, 328 [1878]; Van Voorhis v. County of Monroe, 262 App. Div. 950 [4th Dept., 1941], affd. 288 N. Y. 138 [1942].)
It is obvious why no application wase made to the Board of Estimate for a proper amendment to the map. To have done so would have constituted an admission that the Nicholas Avenue Combined Sewer project was not “ finally authorized ” so as to warrant 1938 Charter treatment pursuant to the “ amendment ” to the 1963 Charter via section 1149. The fact is, though, that *56 this project as it was actually built :and as the assessments were actually made was never “finally authorized” by the board. Thus, even if the court were to find section 1149 valid and apply the provisions of the 1938 Charter, the assessment is still void.
There were other failures to comply with the 1938 Charter. For example, a majority of the area assessed never had a legally adopted drainage plan as required by section 297 (subd. [b], par. [3]); the authorization by the board failed to set forth the estimated cost of the improvement as required by subdivision b of section 300; the map submitted to the board by the Chief Engineer did not clearly show the tentative area which would be benefited by the improvement, per section 297 (subd. b, par. ill).
Finally, the petitioners showed that the improvement produced no increase in the value of their lands. This area already had a sanitary sewer, so we deal with the storm sewer aspect of the matter, to which was attributed about two thirds of the cost of the assessment. The only testimony on resulting value came from two experts, one called by petitioners, and the other by respondents. They both opined that the construction of storm sewers as such resulted in little or no increase in the value of the land affected by the construction.
The Court of Appeals in Matter of Nolan v. Bureau of Assessors of N. Y. City Finance Administration (31 N Y 2d 90, supra), pointed out that there is a presumption in favor of the validity of these assessments and the burden is on the. petitioners to overcome the presumption by affirmative proof. In Nolan (supra) the court found that the petitioners had failed to meet their burden of proof. This court has read the record on appeal in Nolan and the difference between the “proof” there presented and the petitioners’ case herein is like night and day. For one thing, there was not even a trial in Nolan. Special Term had before it only the pleadings and a transcript of the public hearing before the Bureau of Assessors. The “ proof ” offered by the Nolan petitioners consisted of conclusory allegations in their petition and reply and speeches made before the Board of Assessors. They did not offer any real proof at all and, considering that they had the burden of proof, their case had to fail.
In the instant proceeding, however, there was a complete trial lasting many days with extensive direct- and cross-examination and approximately 100 exhibits. Much of this has been discussed, supra. The court concludes that in this case, unlike Nolan (supra), the petitioners have overcome the presumption of validity that attached to this assessment with their overwhelm *57 ing affirmative proof, as well as their persuasive legal arguments.
The court does not believe that the matter lends itself to salvaging some part of this assessment which might be valid under the 1938 Charter, assuming there is anything that could be salvaged. The case falls squarely within Matter of New York Prof. Episcopal Public School (75 N. Y. 324, 329, supra), where the entire assessment was voided and where the court said: 1 ‘ I have had some hesitation upon the question whether a rehearing should be ordered with a view of reducing the petitioner’s assessments, but upon, reflection I do not see how this can with propriety be done. There is no fixed sum or criterion for the court to act upon. The court would occupy the position of the assessors, and the assessment would be according to its judgment, instead of the judgment of the assessors. Besides it would have no power to make the assessments upon the omitted parcels, and thus make a valid assessment for the improvement. I think that the whole assessment is void. (Hassan v. City of Rochester, 67 N. Y. 528.) ” Not only is it not feasible for the court to pick and choose over this assessment, but any fair levy would have to include vast areas left out by the Board of Estimate, which cannot be done in view of section 1149’s “ finally authorized ” language.
The court also agrees with the petitioners that this matter should be treated as a class action.
Comment b of section 86 of the Restatement of Judgments states: “ A class action is an illustration of a situation where it is not feasible for all persons whose interests may be affected by an action to be made parties to it. It was invented by equity for situations in which the number of persons having substantially identical interests in the subject matter or litigation is so great that it is impracticable to join all of them as parties, in accordance with the usual rules of procedure, and in which an issue is raised which is common to all of such persons. Because of the large number, great expense would be involved if all were made parties; in many eases it is difficult or impossible to join them all because some of them are not within the jurisdiction, the whereabouts of some of them are unknown, or the likelihood of death of some of the parties and the consequent abatement of proceedings would unduly delay a decree if all were made parties to the action.
" In such cases the expense and difficulty of making all persons who have interests in the proceeding parties to it outweigh the normal desirability of not depriving persons of causes of action or of defenses without giving them an opportunity to *58 be heard. To take care of these situations the courts have power, by means of a class action, to save the time and expense of possible litigants and of the courts, and at the same time make it possible for a person who is subject to the possibility of litigation with large numbers of others to ascertain his rights and liabilities with reference to all of them.”
At Oarmody-Wait 2d, New York Practice (vol. 3, Parties, § 19:169, p. 472), it is said, regarding class actions: “ In recent years, the implementation of the class action device has been advocated as a means to vindicate the interests of large but unorganized groups of persons whose actual joinder is impracticable, where substantial issues of law or fact are raised in the litigation which are common to all, and the separate enforcement of the individual rights of the members of the class would not be feasible because of the expense of litigation and the legally and factually complicated nature of the controversy. ’ ’
In Kovarsky v. Brooklyn Union Gas Co. (279 N. Y. 304, 314 [1938]) the Court of Appeals permitted a class action by a consumer who sought to void a $1 charge for turning on his gas. The court said: “ On the other hand, plaintiff not only has a cause of action for an injunction, since he is threatened with the collection of the charge, but in that respect he is representative of all those similarly situated. That is also true as to his application for a declaratory judgment. All consumers are interested in a declaration of the law. All consumers, as is this plaintiff, are liable in the future to be subjected to the charge in question.” (See, also, Jones v. Healy, 185 Misc. 400, 405 [Sup. Ct., N. Y. County, 1945]), an action by dissenting stockholders to void an appraisal of shares of stock, where Judge Peck said: ‘ ‘ The question involved in the case at bar is similar to the question involved in the Kovarsky case (supra) for an injunction * * * the legality of an appraisal in this case, the legality of a service charge in that case. The service charge applied to all consumers indiscriminately, and the appraisal applies to all dissenting stockholders indiscriminately.”
Here, too, the assessment applies to all property owners indiscriminately. There is a question common to many persons and an exact identity of interest. The initial questions raised herein, it will be Recalled, were whether or not the 1963 Charter repealed special assessments and whether or not these respondents had the power to levy .an assessment at all. It goes without saying that it would not be feasible to make every affected property owner a party; there are doubtlessly thousands of them. .
*59 The respondents’ opposition to class suit status is based largely on provisions of the 1938 Charter and cases decided thereunder, which the court has determined are not applicable to this lawsuit.
The fixation of the attorney’s fee in this matter cannot be made at this time, however. To use a phrase common to negligence actions, the matter was tried “ on liability only it was not really appropriate to take evidence on the actual amount of the assessment, so the total sum of money involved is not known. Also, it is virtually certain that the matter will wend its way through the appellate tribunals. It is only after this process is completed, and assuming affirmance on the class suit status, that the extent of the attorney’s work will be known.
The court finds the petitioners’ points regarding origination with the Borough President, laches, notice, and applicability of the sewer rent law, to be without merit. The court finds respondents’ contentions regarding Statute of Limitations, failure to exhaust administrative remedy, and scope of review, also to be without merit.
The court commends John J. Turvey, Esq., attorney for the petitioners, and Gary B. Baker, Esq. and Allen Bruton, Esq. of the Corporation Counsel’s office, attorney for respondents, for the superior presentation of their clients’ respective cases, their professional demeanor throughout a long and complex trial, and for their excellent trial memoranda, among the best ever presented to the court. Their conduct of the case has fulfilled the highest standards of the legal profession.

 One of the exceptions was chapter 12 of the new charter, which did away with local assessments and which went into effect January 1, 1962, one year earlier than the rest of the charter.